Filed 5/8/25  In re K.B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re K.B., a Person Coming Under the Juvenile Court Law. | D085343 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. NJ15919) |
| Plaintiff and Respondent, | |
| v. | |
| K.Z., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Nadia J. Keilani, Judge.  Affirmed.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Natasha C. Edwards, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Appellant K.Z. is the 17-year-old mother of two-and-a-half-year-old K.B. In March 2023, K.Z was in high school and K.B. was five months old. When K.Z. arrived at her high school on March 10, 2023, she left K.B. at the school's daycare facility. There, workers noticed extensive bruising to K.B. The daycare employees called 911, after which an ambulance transported K.B. to Rady Children's Hospital. There, doctors examined K.B. finding "extensive bruising to her face, legs, and body including . . . loop and linear marks to her legs" and "subconjunctival hemorrhage to both [of her] eyes." Doctors concluded K.B.'s injuries were "diagnostic of physical abuse." On March 14, 2023, social workers filed a petition in juvenile court to detain K.B.

On March 15, 2023, the trial court asserted its jurisdiction over K.B. The court later ordered reunification services for K.Z., but those proved unsuccessful, resulting in their termination after a year. Social workers reported "[K.Z.] has a history of substance abuse, has engaged in criminal activities, and unsafe behaviors. Such factors have impacted her ability to parent and form a relationship with [K.B.]." Also undermining K.Z.'s relationship with K.B. "there were multiple occasions where [K.Z.] was incarcerated, hospitalized, or report[ed] missing and visitation did not occur."

On December 16, 2024, the trial court held a Welfare and Institutions Code[1] section 366.26 hearing. (See § 366.26, subd. (a).) The court found by clear and convincing evidence that K.B. would be adopted and terminated K.Z.'s parental rights. (*Id.,* subd. (c)(1).) K.Z. argues the court abused its discretion by failing to find an exception to termination because there is a beneficial relationship between K.Z. and K.B. (*Id.,* subd. (c)(1)(B)(i).) We find no error and affirm.

---

[1]     Undesignated references are to the Welfare and Institutions Code.

## DISCUSSION

Section 366.26, subd. (c)(1), instructs us that "[i]f the court determines, based on the assessment provided . . . and any other relevant evidence, by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption." (See also, *In re Marilyn H.* (1993) 5 Cal.4th 295, 309 ["Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability . . . . The court need not continue to consider the issue of reunification at the section 366.26 hearing."].)

However, a trial court may decline to terminate parental rights at the section 366.26 hearing if the court "finds a compelling reason for determining that termination would be detrimental to the child [because] . . . [t]he parent[ ] ha[s] maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) A parent must prove three elements "to establish the exception: (1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child." (*In re Caden C.* (2021) 11 Cal.5th 614, 631 (*Caden C.*).) Here, the trial court found K.Z. failed to show this exception applied, stating, "Any detriment to [K.B.] from the loss of her relationship with mom is vastly outweighed by the safety, stability, nurturing, and care that she receives through adoption. Simply put, [K.B.] deserves the permanency that adoption would afford her.

We review the juvenile court's findings as to this parental bond exception for substantial evidence. (*Caden C., supra*, 11 Cal.5th at pp. 639–640.) As a reviewing court, we do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the

3

juvenile court's determinations even where substantial evidence to the contrary also exists. (*Id.* at p. 640.) "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [her] parent—is discretionary and properly reviewed for abuse of discretion." (*Ibid.*) A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' " (*Id.* at p. 641.)

"The significant attachment from child to parent results from the [parent's] attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) As the trial court correctly observed, K.Z. and K.B. have had little opportunity to build such a bond as, at the time of the termination hearing, K.B. had been out of K.Z.'s care "for 21 out of the 26 months that [the child] ha[d] been alive." Indeed, as the court observed, "[w]ith respect to [K.Z.], she has been incarcerated for the majority of these dependency proceedings, but for the most part had weekly supervised visit with [K.B.] at [K.Z.'s] facility." K.B. has now lived with her caregiver for the majority of her life and has seen K.Z. only during supervised visits.

Further, K.Z.'s visits had been sporadic at times, and for many months were held virtually.[2] The trial court reasonably concluded video visits "are just not the same quality as in-person visits, especially for a child of a young age." The Agency's reports further reflect that K.Z.—who is herself a minor who has struggled with drug addiction and incarceration—is often not able to

---

[2] While K.Z. remained incarcerated the parties used video visits to facilitate contact between K.Z. and K.B.

4

manage basic caretaking tasks during her visits with K.B. Accordingly, the record supports the conclusion K.Z. has seldom met K.B.'s "needs for physical care, nourishment, [and] comfort," and K.Z. and K.B. have had relatively little "day-to-day interaction, companionship [or] shared experiences." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.)

Nonetheless, K.Z. points to K.B.'s behavior during visits, arguing it "indicates an emotional attachment" with K.Z. The juvenile court found "that although [K.B] does recognize [K.Z.] and has recently beg[u]n calling her mommy, the quality of their visits [has] not progressed over the nearly 21-month lifespan of this case. Additionally, [K.B.] has recently begun to show fearful behaviors when the social worker is picking her up for the visits; such as holding onto the door of the home and screaming and clinging to the caregiver. She often refuses hugs from [K.Z.] and does not seek her out . . . during many of these visits. She ends the visits without distress and is described as being happy when she returns to the home of the caregiver." The trial court's assessment is supported by the record.

K.Z. cites portions of maternal grandmother's (Grandmother) testimony in support of her claims that K.Z. and K.B. "share a familial bond with each other"; that K.B. "knows her mother and looks for her"; and that "[K.B.] is excited to see" K.Z. However, at the time of the termination hearing, Grandmother had not seen K.Z and K.B. interact for approximately nine months. Grandmother's testimony is also contrary to Agency and caregiver reports—including those detailing more recent interactions between K.Z. and K.B.—which suggest that K.B. sometimes cries when being taken to see K.Z., shows little affection for K.Z. unless prompted, and has no trouble separating from K.Z. at the end of the visits.

5

K.Z. also claims K.B. "hugs her, kisses her, and says to her, 'I love you.'" But the record reflects K.B. has said "I love you" in response to K.Z.'s prompting on two occasions, and K.B. often rejects or declines to reciprocate K.Z.'s efforts at physical affection. While K.B. had begun to call K.Z. "Mommy," K.B. has also referred to others as "Mommy" or "Daddy," including a male guard and a social worker. In sum, the trial court did not err by concluding that the parent-child bond exception does not apply in the circumstances of this case.

## DISPOSITION

For the reasons stated above, the judgment is affirmed.


RUBIN, J.

WE CONCUR:



DO, Acting P. J.



CASTILLO, J.